Good afternoon, your honors. May it please the court, Rebecca Jones appearing for appellant Anthony Trevino. For most competent, experienced criminal defense lawyers, handing them a plea agreement of a cooperating witness or a cooperating co-defendant is like hanging raw meat in front of a lion. They grab it, they take it, they shred it, and then they use it to shred the witness. They say you have to say whatever the prosecutor wants because you do not want to go to prison. Prison is a terrible place. You don't want to go. You are going to do everything in your power not to go. And here, ladies and gentlemen, are all the reasons why you're not going to, why you're going to say whatever it is that the prosecutor needs you to say to get a first degree murder conviction in this case. Here, however, trial counsel, the California Court of Appeal, and the district court below treated the cooperating co-defendant's plea agreement like pot liver oil. No one wants to touch it. No one wants to get anywhere near it. It has this awful clause in it that you're supposed to tell the truth. And for that reason, it was completely reasonable for trial counsel not to want the jurors to know that the cooperating co-defendant had in fact signed a deal with the prosecution to say what they wanted him to say and to help them get at least one first degree murder conviction out of this case. That is just not reasonable, your honors. The only way that pot liver oil is a reasonable view of the cooperating co-defendant's plea agreement in this case is if your theory of the defense is that the cooperating co-defendant was wrongly accused. He did absolutely nothing. And guess what? I'm just like him. So we're all in the same boat. And yes, I don't want the jurors to think he's an accomplice to anything because I don't want the jurors to think I'm an accomplice to anything, which is a pretty good argument if you're potentially the driver or a passenger in the car during the drive-by shooting. But if you're the shooter, you don't have much of an argument that you did nothing and nobody else in the car did nothing. You have to admit some level of dishonesty. Your honor? No, I'm listening to you, but I'm wondering if you remembering the same case that I read. The shots came from the back seat, didn't they? No, my client was in the front seat. I mean, from the passenger seat? From the passenger, correct. And who had the gun? My client. And so what I think you have to get around, there's no doubt that shots rang out and one person had the gun and that one person who shot apparently shot from the passenger's seat. Isn't that pretty much what this record says? Oh, that's absolutely true. And I have never argued from during any point in this proceeding. Maybe I misunderstood the basis of the argument. I thought you were saying that here's a person who will tell a lie in order to get himself off. And so he puts everything on somebody else. And I think you can make that argument. But here, there's some facts. There are many facts that are undisputed, but the only person who gave the premeditation evidence was the cooperating co-defendant. The only person who said, I asked Tony why he shot the gun twice. And Tony said because he thought the guy saw our faces or the license plate was the cooperating co-defendant. And so when this case is either an involve, which is what the two co-defendants who went to trial got, or a second or a first, the statement that Tony said he had a very specific reason for firing the gun is absolutely essential to the premeditation finding in this case. And very well may have made the difference between a first and a second or a first and an involve. Well, the facts show that there were, well, you tell me. We've just looked at the record. The three of them were going to shoot up the car, I suppose, that had done whatever they thought was wrong. But then the next, the shot that killed the victim wasn't during the time they were shooting up the empty car. It was during a subsequent shoot. So what does that leave us? Well, first of all, there is actually testimony from Cynthia Ward, and it's said she heard eight shots in succession without a break. So there's some contrary evidence about whether there was two completely different sets of shots. Second of all, the testimony showed there was a set of shots, and as the car went around the corner, which I'm assuming, I don't have the diagrams in front of me, was probably around an occupied building that he did not want to shoot at. It stopped briefly, and then the shot started again, which would make sense if he was continuing to shoot only at a vehicle. So again, I don't think I can hear what Your Honor's concerns are, but I think that the fact that there are two sets of shots in this case does not make this case a per se first degree murder. It just, first of all, it's not undisputed that there were two sets of shots. And even if it, the most reasonable interpretation of the fact is that there's two sets of shots, that does not per se make this a first degree murder. What made this case was a first degree murder was the cooperating co-defendants' testifony, testifony, sorry. And where the victim was standing in relation to the car. Doesn't that get on the scale? You mean in relation to the car that was shot, or the car that was shot from? The car that was shot. Yeah, if he was way, way ridiculously far away, but I don't think that's what the evidence shows. I actually, I don't know. Anybody tries to put him way, way far away, there was some distance between the person who was killed and the car that was shot. That's true. But there's also some imprecision when you're doing a drive-by, which of course none of us would want anybody to actually do. But, you know, when the car is speeding through a trailer park with its lights off, there's going to be some imprecision in the way that the shots are fired and, you know, it was a very dark night. There were some tinted windows and it's not at all clear, again, except for the cooperating co-defendants' testimony that there was a reason, you know, an identification of a likely victim and a decision to shoot a likely victim for a premeditated reason. Well, I'm not, we haven't decided. We listened to your argument because we haven't decided. But it seems to me the status of things, the facts here, there was a car, unoccupied, that three people wanted to shoot up and one had the gun and that one person shot that car without a doubt. Then there was an debrief and the person who was killed had to be in position to see the car as it drove past him. So all of those things are here, but there was an interval of delay. And you say the only thing was the testimony of the one person who said, I ask the question, but root it out, say it was nothing. That was the shooting, that was the delay, and then that was shooting the victim who wasn't in the car, wasn't standing by it, and it killed him dead. I think the DA could argue a further from that, but I think that the jury, at least one reasonable juror, and of course that's all we need under Strickland, at least one reasonable juror could have interpreted that instead as a second, or as an interval, shooting into, shooting toward an unoccupied vehicle. I wouldn't get a second because the unoccupied, we passed the unoccupied vehicle when the victim was shot, and you've got somebody standing there with the victim having a conversation. So that person, without regards to what the victim in the car, because that was a conversation between the victim and a person, and that person, I don't know, I'm not trying to retry the case by looking at this record, but you're thinking the only thing there is his testimony, and I think this record would say that there's more there than just the testimony. I think that an influence... And I'm not criticizing you representing your client. You're supposed to make anything you can make go for your client's benefits, but those facts are going to be hard to get around, I would think. There's no doubt there's difficult facts in this case, and we've never tried to say they're not difficult. And it's the silliest thing anybody ever heard of, because both of the shootings shouldn't have taken place. Obviously. Obviously. And I know if my client could take it all back, and if a victim could take it all back, but we're not. So your time's up, but you haven't addressed at all, if the second motion to sever had been made, how would your client have... I mean, why did the failure to make the second motion to sever on inconsistent defense grounds prejudice your client? Two reasons, Your Honor. First of all, the redacted statements of the co-defendants, Gutierrez and Connolly, wouldn't have been admitted at a separate trial, and again, those were very problematic toward the first-degree murder theory, with especially, I believe it was Gutierrez saying, I told him not to shoot. I told him not to shoot. It was dangerous. Which, of course, him shooting after hearing that, I think, leaves a strong inference to the premeditation allegation. And for the same reason that actually trial counsel made very clear that if he'd had a separate trial, he would have insisted on the jurors getting an accomplished instruction, which was the issue that I started discussing at the very beginning. So jurors, he would have insisted, he would have been more competent, had there been separate trials, and insisted on asking for an accomplished instruction and potentially used it the way I suggested. And then the improperly redacted statements of the co-defendants, which again were some evidence of premeditation, would not have been admitted at a separate trial. So if he had actually pursued the severance again after reviewing the redactions and seeing the problems with the jury instructions, he would have benefited the client in that way. All right. Thank you, counsel. Thank you, Your Honor. Good afternoon. Deputy Attorney General Matt Mulford on behalf of the warden. I don't want to belabor the point, but in 2005, we did not believe this Court had appellate jurisdiction, and we do not believe that this Court has appellate jurisdiction today, assuming that there is appellate jurisdiction. Every court that has looked at this has come to the correct resolution on the merits of the three different ineffective assistance of counsel claims. Judge Ferris, I think you understand the situation exactly. There was certainly an agreement as to all four people that were originally charged and the three that went to trial together to shoot something up. Their defenses to that are all the same. They all went to shoot something up, and then they didn't want someone to be killed. So there is really no antagonistic defenses. Well, whether they didn't want, the plan was not to kill somebody. I think that's fair. Initially, that is probably fair. But what we do have here is a difference in culpability between all three people that may have initially had one plan and had something else happen. But the only reason Tovino got first-degree murdered, though, was because of premeditation. So how is that consistent with the plan being not to kill someone? Well, plans can change. And under the circumstances here, I think the jury concluded, based on ample evidence, including, Judge Ferris, everything that you pointed about, the scene and 11 shell casings and nine bullet holes in one car and two that happened somewhere else, that someone, the shooter in this case, wanted to kill somebody. And they put two shots, one of them in the heart of the man that is now dead. So that can be premeditation. No, premeditation has to be something other than the person was dead. And I'm wondering, and I'm really wondering in this case, is there any other evidence of premeditation than the statements of the two codependents and the testimony by the person who entered into the plea agreement? What's the other evidence of premeditation? Well, the strongest evidence would be from the one person who pled guilty. Let's not forget the security guard who saw four of them meet, though, and saw a gun change hands and then left the scene because he didn't want to be involved with anything having to do with guns. Actually, I may have spoke. He heard a discussion about a gun. I'm not sure if he actually saw the gun. And then there's people after the fact that discussed the shooting and why it happened and how Mr. Davino's hands were shaking. So there's more than one isolated statement. But even if we consider that one isolated statement. My memory may be off, but I thought it was the person who did the shooting who said his hands were shaking, not somebody who observed him. That's true. That statement is attributed to him in the record, in the evidence that was printed into the jury by the man who pled guilty. All right. I see. I thought you said my memory may have misunderstood you. I thought you were saying that somebody saw his hands shaking, and I didn't think that. I may have misspoken. I apologize for any confusion. If there had been a separate trial, would the co-defendant's statements have come in against Davino? Yes, under Richardson v. Marsh and all the pre-Crawford cases. This was actually what they talked about at the first suppression motion, is whether or not they could put all these people together. And they all made statements to police at various times. But what statements could be admissible and limited in such a way that they did not, I forget the Richardson phrase, but directly implicate any particular defendant. They spent a lot of time with this. They worked over this. And they decided that they could. And they did, and it would have been. The law has certainly changed a lot on confrontations since then. But it would have been admissible in a separate trial. As I talked about the accomplice instructions, they all had the same defense. They were all there together. They were all friends. They all had one plan. But they had different levels of culpability, and that's the jury question that the jury decided. If you ask me, I think two guys got off quite easily here. I think they all should have gone down for first-degree murder. Because they were all admitted co-conspirators. And the murder occurred during the conspiracy. Well, what was the basis for finding premeditation for Trevino and not for the others? I guess that we share the same observation. One person, I don't know. My answer is that the jury was dealt leniency and mercy towards two of them. And that's how I understand the record. Because they didn't have the gun. Right. Correct. They didn't have the gun, and it is at least plausible under the circumstances that Trevino's plan changed in a very short period of time. And that's where the shell case is. Correct. Yes. As far as continuances, the counsel looked at the videotapes, the videotape interviews with all the defendants before he agreed to take the case. He agreed to take the case three days before he was formally substituted in. He agreed that he'd be ready, prepared to go for trial. The trial did not actually start for 30 days. There's never been any indication of what other evidence could possibly be discovered other than the possible atmospheric conditions. This is a killing that occurred at 10 o'clock at night. The counsel wanted to check the sky, but it was too bright. He honestly couldn't do his testimony. So presumably we needed to wait from May until December until the conditions were the same. If nothing would have come up, nothing would have changed. Accomplice instructions, that's an issue of state law. State courts have looked at this and said this is not a problem under state law. And counsel may have made a decision that other attorneys would not have made, although two of them in the same trial did. That's not the standard for Strickland. That's not the standard for tactical determinations under Strickland. I see I'm running out of time. If there's anything else I would ask this Court to dismiss or an alternative if I may. Thank you, counsel. All right. Chavino v. Prenti is submitted, and this session of the Court is adjourned for today.
judges: Farris, Wardlaw, Schwarzer